WALTER O. SHULTS, APPELLEE, v. CHICAGO, BURLINGTON & QUINCY RAILWAY COMPANY, APPELLANT.

FILED JANUARY 23, 1909.    No. 15,443.

Railroads: LICENSEE: DUTY OF LICENSOR. "Where one enters upon the premises of another with his consent, but without an invitation, and not in the discharge of any public or private duty, he is a bare licensee, and the occupier of the premises owes no duty to him as long as no wanton or wilful injury is inflicted upon him by the licensor or his servants." *Chesley v. Rocheford & Gould*, 4 Neb. (Unof.) 768, approved and followed.

APPEAL from the district court for Lancaster county: LINCOLN FROST, JUDGE. *Reversed.*

*J. E. Kelby, Halleck F. Rose, Frank E. Bishop* and *Fred M. Deweese,* for appellant.

*Shepherd & Ripley, contra.*

FAWCETT, J.

On February 28, 1906, the yards of defendant in the city of Lincoln, in which freight trains were made up and freight cars weighed, consisted of a network of tracks, which, by reason of limited area, ran very close together. By reason of the large number of trains and cars handled in such yards, both night and day, it was a very busy place, and a very dangerous place for persons not familiar with the business of the yards. It was used exclusively for the purposes of defendant, and was not in any man-

ner open to the public.  On the evening of that day, some time between 7 : 30 and 10 o'clock, the plaintiff went to the night yardmaster, and, as plaintiff testifies, "asked him if he could tell me where Kimballs' two cars were, and if I could get permission to go and see him; that I had some business to transact, and he told me they was over northeast.  I believe he said X six, or six X, something.  If they are not on that track, they are on the scale track, in the neighborhood.  He said: 'You go down in there, and some of the hands will show you where they are.'  I went down there, and got there without any accident.  I was pretty cautious not to have any.  I kept track of the tracks wherever I went across.  *  *  *  I found a man there with a brakeman's lantern.  *  *  *  I asked him where Kimballs was, and he said they were over in the car, and showed me the light in the car door. *  *  *  I went right down to the car and got in.  I found my cousins there."  It seems that the Kimballs were cousins of plaintiff, and were shipping two cars of freight from Palmyra to York.  One of the cars was what is called an "emigrant" car.  In one end there were five horses and three mules, standing crosswise in the car, and tied to a piece of 2 by 4 spiked to the side of the car.  The other end of the car contained farm implements and household effects.  The middle of the car between the two side doors was a clear space where the Kimballs were riding, and where it appears they intended to sleep that night. The horses and mules were separated from the rest of the car by two pieces of 2 by 8 and two pieces of 2 by 4 timbers across the car, fastened with 20-penny spikes.  After entering the car plaintiff and the Kimballs sat down and engaged in friendly conversation.  About 15 or 20 minutes after they had seated themselves the car in which they were seated suddenly received a severe jolt by having other cars bumped against it, the result of which was that the horses and mules were thrown off their feet, their tie straps and ropes broken, and the animals precipitated

21

through the barricade, completely breaking it down. Plaintiff and his cousins testified that one of the mules fell across plaintiff and the other animals upon top of the mule, the result being that plaintiff was so severely injured that he was laid up for a number of months, and, as he claimed, was not entirely well at the time of the trial. The trial resulted in a verdict and judgment for plaintiff for $1,000, from which judgment defendant appeals.

There is no dispute that plaintiff received the injury complained of, and in the manner above stated. Plaintiff argues that the shock to the car was so great as to show negligence on the part of the defendant. The testimony of the train crew doing the switching is that they had been weighing the cars upon that track. The weighing was done by pushing the cars up an incline to an elevation of some five or six feet, and, when the top of the elevation was reached, uncoupling them, one at a time, and permitting them by gravitation to pass down and over the scales, which weighed each car automatically as it passed over. The evidence also shows that, in order to permit a correct weighing by the automatic scales, a car must pass over it at a low rate of speed; that a speed of even five or six miles an hour would be so great that the scales would not correctly weigh the car. The members of the train crew all testified that on that evening, while handling and weighing the cars which caused the injury, the work was done in the usual and customary manner, no greater speed or bumping of cars occurring than was customary in the yards.

When both sides had rested, defendant moved the court to instruct the jury to return a verdict in favor of the defendant, which motion was overruled. The question as to whether or not the court erred in overruling this motion depends entirely upon the duty which defendant owed plaintiff at the time he received the injury complained of. The night yardmaster was called by defendant and interrogated as to what took place at the time plaintiff received his license to enter the yards. He says: "The gentleman

that came into my office asked me about a car that was shipped from Palmyra to York. Q. Anything said about who was with it? A. Well, not that question. That was the first question that the gentleman asked me, and I asked the bill clerk if we had anything of that description, and he said we had a car of emigrants that came in from Palmyra on 3, and that the car was going to York. So I then told the gentleman. I told the gentleman that the car was there, and he asked me where he could find it. He said that the car was shipped by his cousin, and that he wanted to see him, asked me about where the car would be situated, and I told him that the car would have to be weighed here, and it would undoubtedly be on X 6. Q. That the scale track? A. The scale track. At least, if it wasn't there now, it soon would be. Well, he said that he guessed he could find it all right, and he asked me was the scales situated where they formerly was near the same house, and I told him 'Yes,' and I said to him, I said, 'You belong with the car?' and he said, 'It is my cousin's car, and I want to see him.' He says, 'I live here in town, and they are shipping through, and I haven't seen him for some time, and I want to see him.' And I said, 'Well, you understand this is a very dangerous place here,' I said, 'for anybody to be prowling around through the yard.' Q. About what time was it? A. This was, I should say, about 7:30. I know I had just got done my little preliminaries for starting the men at work at 7 o'clock after coming to the office and sitting down to the desk. He said he realized that, and I said, 'If you go down into the yards, you go at your own risk,' and he smiled, and started out of the office; and I said, 'You are not even safe right here in the office.' I said that in a bantering way more than anything else, because I thought he was ignoring what I said to him. I said, 'You are not even safe right here in the office in the Lincoln yard.' With that he turned and went out of the office. I did not see the man again until he was taken out of the car."

Plaintiff on redirect examination, while testifying in chief, was asked this question: "Q. Did you have any conversation with this overseer or yardmaster, the man that directed you about the dangers of the place? A. Well, not only he said I would have to be pretty careful. Q. Were you careful? A. I was. As I stated once before, I went up between the tracks where the brakey walks, so in case a collision or anything of that kind comes with the cars I would be out of danger." On recross examination he testified: "Q. You say that the man did warn you that that was a dangerous place? A. Yes; he said I would have to be careful. Q. Well, did he say anything more than that? A. Not that I recollect; no, not only giving me the directions. Q. But about the taking care? A. Sir? Q. About taking care, or about the risk of the place? A. No, sir; he didn't say anything, only he says you want to be careful, it is dangerous, something of that kind. Q. You don't pretend, then, to remember all that he said about that? A. Well, that is in the neighborhood of all he said." Plaintiff was placed on the stand in rebuttal, and testified as follows: "Q. Mr. Shults, when you went into the yard office and asked permission to go out to these cars, to where they were, state whether or not the yardmaster said to you that, if you went out there, you must go at your own risk? A. I think not. He said nothing of that kind as I understood."

This is substantially all of the testimony in relation to the permission that was given plaintiff to enter defendant's yards on that occasion. Viewed in the light most favorable to plaintiff, it establishes the fact that when he entered the yards of the defendant, and at the time he was injured, he was a bare licensee. He was not there as a passenger or servant, nor under any contractual relation with the defendant, but had been permitted to enter upon the premises for his own interest, convenience or gratification. In such a case the authorities substantially all say that the rule is well settled that an owner of premises owes to a licensee no duty as to the condition of such

premises, unless imposed by statute, save that he should not knowingly let him run upon a hidden peril, or wantonly or wilfully cause him harm; that the licensee enters upon the premises at his own risk, and enjoys the license subject to its concomitant perils. 29 Cyc. 451, and notes 69 and 70, citing a large number of authorities from many states, including the decision of this court in *Chesley v. Rocheford & Gould*, 4 Neb. (Unof.) 768. In that case we held: "Where one enters upon the premises of another with his consent, but without an invitation, and not in the discharge of any public or private duty, he is a bare licensee, and the occupier of the premises owes no duty to him as long as no wanton or wilful injury is inflicted upon him by the licensor or his servants." The writer presided as the trial judge in the trial of that case, and, following the well-established rule, directed a verdict in favor of the defendant, which this court affirmed. The same rule is announced in 3 Elliott, Railroads (2d ed.), sec. 1250, where reference is made to a long line of decisions in support of the text. In December, 1907, the supreme court of Illinois in considering this rule said: "If a mere licensee goes upon another's premises for purposes of his own, and not for any purpose connected with the owner's business, the owner's duty to guard him against injury is governed by the rules applicable to trespassers, and he can recover only for an injury knowingly and wilfully inflicted." *Pauckner v. Wakem*, 83 N. E. 202, (231 Ill. 276). In *Glaser v. Rothschild*, 106 Mo. App. 418, 80 S. W. 332, the same rule is announced, and *Chesley v. Rocheford & Gould, supra,* cited with approval.

Counsel for plaintiff place a good deal of reliance upon *Chicago, B. & Q. R. Co. v. Wymore*, 40 Neb. 645, and *Omaha & R. V. R. Co. v. Wright*, 47 Neb. 886, but those cases are clearly distinguishable from the case at bar. In the former case it appears that about 2 o'clock in the morning a special freight train, west-bound, failed to get onto a side-track at Mullen in time to get out of the way of an east-bound train, which resulted in a collision that

piled the two engines and a number of cars up in a heap upon the two tracks and upon the space between them. Wymore was a section foreman in the employ of the railroad company, and resided in a section house upon the right of way of the railroad, south of the tracks, west of the station, and almost due south of the point where the west-bound engine stood at the time of the collision. A young lady who had come to Mullen that day for the purpose of taking a passenger train which was due about half past 3 o'clock in the morning had gone to Wymore's house, and she and Wymore left the house for the depot about 2 o'clock. When the wreck was cleared away, their dead bodies were found beneath the wreck and between the side-track and the main track. A public roadway, accessible from Wymore's house, crossed both tracks between Wymore's house and the station, which was situated north of the main track. In the opinion it is said: "The inference is that Wymore and Miss Wilgus, on leaving the house, found the roadway blocked by the west-bound train on the side-track, and, in the effort to reach the station, crossed the side-track at a point almost north from Wymore's house, and were proceeding between the two tracks toward the depot when the wreck occurred. There was evidence tending to show that the tracks were at that point from 15 to 25 feet apart. * * * We can conceive a case where the right of way of the railroad is protected by fences, where ample means of ingress are offered the passenger by absolutely safe methods, and where the attempt of a person to approach a station along the right of way would be so hazardous, so difficult, or so unusual that a jury could hardly be justified in finding that the company in operating its trains should be required to exercise any precaution to avoid injuring such persons. On the other hand, there are many stations in this state where the station house stands upon the open prairie, where the means of approach are by roads which are nothing more than partly beaten paths over the prairie, where the most convenient and the generally used means of access is over

and along the company's tracks. In such a case the company has every reason to expect that persons having occasion to approach its station probably will be found near the station and along and upon its tracks, and a jury might reasonably find a company wanting in due care in the operation of its trains under such circumstances where such an inference, under the circumstances first mentioned, would be unreasonable." Under that state of facts we said in the second paragraph of the syllabus: "A railroad company does not discharge its whole duty by refraining from wantonly injuring a trespasser upon its tracks after observing his position. It is bound in all cases to exercise reasonable care to avoid injuring all persons who are known to be, or who may be reasonably expected to be, upon its right of way."

In the latter case above cited the action was to recover damages on account of cattle, belonging to plaintiff, killed and injured by a train of the railway company. The allegations of the petition were: "First, that a gate on one of the fences along the right of way was insufficient and negligently permitted to be out of repair, and that by reason of those facts the cattle got upon the right of way; second, that after they got upon the right of way their injury resulted from the careless operation of the train." The position taken by the defendant in that case was that the cattle were trespassers upon the right of way of the company. The evidence showed that there were about 340 cattle along the right of way; that, while there was a curve in the road near the point where the cattle were struck, there were no cuts, grades or other obstructions which would prevent a clear view of the track for a distance of half a mile. The accident occurred shortly after 7 o'clock on the morning of December 15. Some of the witnesses testified that it was a clear morning and quite light at that time; others, that it was misty and dark. The court submitted to the jury the question of the defendant's liability under instructions that, "if the engineer saw the cattle, or by the exercise of due care should have

seen them, in time to stop the train and avoid the accident, the company was liable for his not doing so." On those facts we said: "It is the duty of an engineer in charge of a train to exercise such a lookout as is consistent with his other duties to ascertain the presence of obstructions on the track, and, if such a precaution would have revealed the presence of stock in time to have avoided their injury by the use of ordinary care, the railroad company is liable for injuries inflicted upon them, although they were not actually seen until too late to avoid striking them, and although they were not within the protection of the statute requiring tracks to be fenced." We do not see how this case has any application to the case at bar.

We fully recognize the rule laid down in the former of the two cases above referred to: "A railroad company does not discharge its whole duty by refraining from wantonly injuring a trespasser upon its tracks after observing his position. It is bound in all cases to exercise reasonable care to avoid injuring all persons who are known to be, or who may be reasonably expected to be, upon its right of way." But can such a rule be applied to the facts in the case at bar? We think not. The evidence shows that the train crew that was engaged in the weighing and switching of the cars which caused the injury to plaintiff had no knowledge, information or notice of any kind that plaintiff was in the car, or that there were any strangers in the yard. It is true the night yardmaster knew that plaintiff had gone down into the yard to see his cousin, who was on an emigrant car then in the yard; but we do not think it was any part of his duty to send word all through the yards to the various train crews there at work that he had given plaintiff a license to go into the yards on a private mission, and for them to be on the lookout to avoid injuring him. In other words, giving the most favorable construction to plaintiff's theory, before the company could be held liable under the facts in this case, plaintiff would have to show that the defendant's agents engaged in the switching and operating of the cars

which caused plaintiff's injury knew, or had reason to know, of his presence in the car. *Pettit v. Great Northern R. Co.*, 58 Minn. 120.

We deem it unnecessary to further pursue the citation or discussion of authorities, as a careful and painstaking investigation of our own has satisfied us that they are substantially all one way. Under this settled state of the law, defendant did not owe plaintiff any such duty as rendered it liable for the unfortunate injury which he received. The district court should have directed a verdict in favor of the defendant; and, for its error in refusing so to do, its judgment must be

REVERSED.