WALTER O. SHULTS, APPELLEE, V. CHICAGO, BURLINGTON
& QUINCY RAILWAY COMPANY, APPELLANT.

FILED MAY 29, 1912.  No. 17,132.

1. Railroads: LICENSEE: DUTY OF LICENSOR. "Where one enters upon
   the premises of another with his consent, but without any in-
   vitation, and not in the discharge of any public or private duty,
   he is a bare licensee, and the occupier of the premises owes no
   duty to him as long as no wanton or wilful injury is inflicted
   upon him by the licensor or his servants." *Chesley v. Rocheford
   & Gould,* 4 Neb. (Unof.) 768, followed and approved.

2. Appeal: REVERSAL. The evidence in this case examined, and found
   not to be materially different from that taken at the former trial.
   *Shults v. Chicago, B. & Q. R. Co.,* 83 Neb. 272. The principle

therein announced that the plaintiff is a bare licensee, and that the occupier of the premises owes no duty to him as long as no wanton or wilful injury is inflicted upon him by the licensor or his servants, is declared to be applicable to this case and requires the reversal of the judgment of the district court.

3. **Railroads:** INJURY TO LICENSEE: LIABILITY OF LICENSOR. Where the plaintiff, without the knowledge of the train crew, but with the knowledge and consent of the yardmaster of the defendant railroad company, went upon the freight yards of said company in the night time, and while he was there entered one of its emigrant cars for private business of his own with the occupants thereof, who were moving from one Nebraska town to another, was injured during the time that the said car was being weighed and switched in the usual manner, *held*, that he was a bare licensee, and that the defendant railroad company owed him no duty as long as no wanton or wilful injury was inflicted upon him by the servants of the company.

APPEAL from the district court for Lancaster county: ALBERT J. CORNISH, JUDGE. *Reversed.*

*James E. Kelby* and *Byron Clark,* for appellant.

*Shepherd & Ripley,* contra.

HAMER, J.

As damages for a personal injury, the plaintiff recovered a judgment in the district court for Lancaster county against the Chicago, Burlington & Quincy Railway Company for $1,000 and costs. The railroad company has appealed. This is the second appeal. *Shults v. Chicago, B. & Q. R. Co.,* 83 Neb. 272, contains the opinion of this court on the former appeal.

On private business of his own, the plaintiff went down into the freight yards of the defendant railroad company at Lincoln on February 28, 1906, and visited his two cousins, named Kimball, who were moving from Palmyra, Nebraska, to York, Nebraska, in an emigrant car. In one end of their car they had furniture and in the other end of the car they had five horses and three mules. They had attempted to build a fence about the horses and

mules. The horses and mules were in the south end of the car. They stood crosswise in the car, and were tied up to the side of it. There was a partition between the horses and mules and the empty space which was between the two doors of the car. When the plaintiff reached the car he found his cousins occupying this space. The plaintiff seems to have noticed the partition, and he remarked to one of his cousins that "if he was going to sleep there it should be pretty solid, because if they chugged the car the car might accidentally throw them (the horses and mules) on him." When the plaintiff was going down to the freight yard where his cousins were, the testimony shows that the yardmaster told him that the particular car in which his cousins were had not been weighed yet, that it was on the "6X" track. The "6X" track was the "scale track." There is testimony that the yardmaster told him that it was a dangerous place for any one to be wandering about. It was between 8 and 9 o'clock, and a dark night. The plaintiff says it was a dangerous place to go at night. He was shown the way to the car and got into it. It stood in the yards which were used exclusively for the business of the railroad company, and it was on the scale track in a string of cars which were being weighed. The members of the train crew testified at the trial that, while handling and weighing the cars which caused the injury, the work was done in the usual manner, and that no greater speed and no more bumping of cars occurred than was usual when the cars were being weighed. While it is contended by counsel for the railroad company that the public were not permitted to go to this yard, it is in evidence that there was no fence around the part of the yard where the car stood and where the injury occurred, and there were occasional passengers who got on and off of some of the freight trains that stopped in that neighborhood; and there was a small lunch counter in the vicinity, where the employees of the railroad company and a few passengers who rode on a part of the freight trains ate their meals. The conductor

or other employees of the railroad company directed such passengers as came there on trains to the foot of the stairway which led out of the freight yards to the top of the "O" street viaduct. The locality was not so much frequented by passengers or by the public that the employees operating the defendant's trains and switch engines could reasonably expect some one· to be there at any time. There is no evidence that passengers boarded the train or left it while it was standing on the scale track, and that track was used expressly by the company and for the purpose of weighing freight cars and switching them. It is common knowledge that it requires no great jolt to throw horses and mules off their feet when they are confined in a freight car, and if the partition was only constructed of pine boards or pine lumber, as seems to be shown by the evidence, then it would be crushed and broken to pieces if the horses and mules, or a part of them, fell against it or fell down upon it, and the plaintiff in such event would quite likely be injured, although the employees of the defendant might exercise reasonable care.

The plaintiff had been in the car only 15 or 20 minutes when the accident happened that resulted in his injury. He testified that he did not know whether the car stood on the scale track or not. He also testified that he was uncertain whether the jolt came from an engine or from another car. It is uncertain whether the particular car was driven against another. When the jolt came the partition between the horses and mules and the empty space was broken down, and one of the mules fell "square on the side" and on top of the plaintiff. The plaintiff seems to have been injured and was not able to go to work at his old employment.

The injury occurred in the freight yards of the company near the viaduct on "O" street. It seems that the jolt occurred while the railroad people were weighing their cars. They would take the car up on to a "hump" in the track 3½ feet high, or a little more, the car would

be let down, and would run across automatic scales which weighed the car as it went across. The cars seem to have been bumped together for the purpose of coupling them, but it is uncertain just how the injury occurred. The car in question seems to have received the customary "bump," or was bumped against another car. The safety of the plaintiff depended upon the force of the "bump" and whether the partition was strong enough to resist such force. The plaintiff was familiar with the yards. He knew where the switch shanty, the scale track and the scales were. When the plaintiff went into the freight yards and entered the car with his cousins, he knew that he was taking some risk, because he knew that he was in a car where there were 5 horses and 3 mules, and that if the fence broke by reason of a car or an engine coming in contact with the car that he occupied, or because the car he occupied came in contact with another, then the mules and horses might be precipitated upon him unless the partition was strong enough to sustain their weight. He saw the partition and knew it was made of pine.

The plaintiff testified that there were cars on the track on each side of this car, that is, both north and south of it. The testimony of William G. Kimball, one of the cousins, is to the effect that there were cars both to the north and south of this car, and coupled to it. He does not know whether there was an engine on it at either end or not. He testified that he and his brother built the partition out of pine lumber. He does not describe this partition in detail. It may have been a flimsy affair and without much power of resistance. Marthenson, one of the switchmen, testified, as shown by the abstract: "The pieces of the partition in the car, I took out; they were broken all to pieces. The fiber of the lumber was not strong; it was pine lumber." From this statement it would seem that the lumber was brittle, easily broken, and probably had very little power of resistance.

E. J. Spratt testified: "I remember handling four or

five emigrant cars, and I believe they said a man got hurt in one of them. I remember one of the cars we had been handling was taken back to the yard office in order to take the man out; that was one of the string that we had been handling, yes, sir, just before that. Just before they came to take the car to the yard office we had been running them over the bump, the scale track, over the scales. I was car catcher—got on top of them to hold them, with brakes; after they had been cut off from the engine and came over the scales; I got them and held them as near as I could a car or two lengths from the scales; I cannot just say how many were in that string, something like 15 or 16 cars. The engine was south of the scales and the cars were north of the engine. Johnnie Ferguson was cutting them off before they went to the scales." This witness testified: "In letting that car over the scales and down to the incline there was no unusual movement of the car. I don't think we had to bump it any more than the rest; we had to bump it to make the coupling. The car, after it gets weighed, runs about two car-lengths before it hits the others. The car has to go across the scales slowly. I rode the first car down and held it and let the rest couple on. The ordinary method, the usual, every-day method of doing that was just as we did it. I had been doing that for some time, had been working in the yards of nights for four years."

John Johnson testified: "I remember the occasion of a man, Mr. Shults, getting hurt in the yards there in one of the cars about that time. * * * I know about the car being taken out of the string we had been handling. We had just weighed them. The engine was south of the scales, the cars north from the engine. We had about 15 or 18 cars. The engine pushed the car slowly up the incline and then the car was cut loose and weighed. * * * After they pass over the scale a man gets on top of the first one that goes over and sets the brake and keeps them moving. You know you let them run about a car-length from the scales and then stop them until the next car

comes along down; they bump against each other as they come down off the scales in order to couple them together, and then extend on down north on the track. * * * The whole string, including the emigrant cars, were let down over the scales that night slow in order to weigh them. You can't let them go fast over the scales because they won't weigh. There was no one of the cars that went down over the scales fast that night that I remember of. They come together with a bump after they go over the scales in order to couple them. From the time they are let loose until they bump another car is about two car-lengths or three car-lengths. They do not go over the scales fast. There was no time that evening when the engine pushed a car over and forced it against the others. After we got through weighing we took the engine and coupled onto them. After the whole string is weighed we throw the switch and go down with the engine, couple them up, and pull them back past the scales. We left them on the side track. I had five or six cars of emigrants."

He went into the yards after he had been warned that there was danger. He knew the conditions by which he was surrounded. He knew that the car was yet to be weighed. He saw the partition that separated the horses and mules from him and from the place he was compelled to occupy, and he must have known that he was more or less in danger because the partition was likely to be broken down by the horses and mules, or a part of them, falling against it or upon it, if another car or an engine should strike this particular car, or if this car should be struck by another. He saw the fence and had an opportunity to estimate its strength when he looked at it, and knew it might be broken down. It was necessary to use some force to couple the cars together. In any event that is the way the employees of the company did the work. The railroad company had no contract of any kind with the plaintiff. He was not in their employ. They were not carrying him as a passenger. Was the railroad com-

pany bound to handle the car in which the plaintiff was
visiting his cousins in any manner , different from the
other cars which they were weighing?    The other cars
were taken up to the top of the "hump" on the "scale
track," and they were then passed slowly down over the
automatic scales so that they might be weighed as they
passed over them.   They would run a short distance below
the "hump."   Then each car was "bumped" into from
time to time as the cars were coupled together, or it was
bumped against another car.   Was it the duty of this
company to refrain from bumping this particular car be-
cause the plaintiff was in it?   The plaintiff was hurt be-
cause he occupied an unsafe place after he had been
warned of the danger and had observed and mentioned it,
and while the company seem to have been handling their
freight cars, including this particular one, in the usual
way.   There is no evidence that the train crew knew he
was in the car at the time they weighed it.

The freight yards or switch yards, as they are some of
the time designated, were not fenced.   There was no way
to prevent the public from going to the place where the
car was found.   The plaintiff went into the yards by the
consent of the company's servants, and he was therefore
not a trespasser.   The car occupied was driven against
another car, or another car was driven against it, so that
the animals broke loose from their head fastenings and
fell against the partition and broke it down, and so the
plaintiff was injured.

The court said in the former case: "Viewed in the light
most favorable to plaintiff, it (the testimony) establishes
the fact that when he entered the yards of the defendant,
and at the time he was injured, he . was a bare licensee.
He was not there as a passenger or servant, nor under
any contractual relation with the defendant, but had been
permitted to enter upon the premises for his own interest,
convenience or gratification.   In such a case the authori-
ties substantially all say that the rule is well settled that
an owner of premises owes to a licensee no duty as to the

condition of such premises, unless imposed by statute, save that he should not knowingly let him run upon a hidden peril, or wantonly or willingly cause him harm; that the licensee enters upon the premises at his own risk, and enjoys the license subject to its concomitant perils." In *Chesley v. Rocheford & Gould,* 4 Neb. (Unof.) 768, it is held: "Where one enters upon the premises of another with his consent, but without an invitation, and not in the discharge of any public or private duty, he is a bare licensee, and the occupier of the premises owes no duty to him as long as no wanton or wilful injury is inflicted upon him by the licensor or his servants."

The evidence in this case seems to be almost identical with that taken at the former trial. We think that the principle announced by this court at the former hearing disposes of this case. The rule laid down at the former hearing and in *Chesley v. Rocheford & Gould, supra,* compels us to hold that the plaintiff was a licensee, and was entitled to such protection only as the company could conveniently give him under the circumstances, and without a special effort made on his behalf, and there was no negligence upon the part of the company unless it wilfully and needlessly caused the partition to be broken down by the application of excessive and unnecessary force in weighing or handling the car, and thereby caused the animals in it, or at least one of them, to fall upon the plaintiff. And of this there seems to be no evidence. The plaintiff voluntarily took the risk, and the evidence is insufficient to sustain the verdict rendered. The defendant moved for a directed verdict against the plaintiff. This motion should have been sustained.

The judgment of the district court is

REVERSED.

SEDGWICK, J., concurs in conclusion.

REESE, C. J., dissents.