## ST. MARY'S HOSPITAL v. SCANLON.
### No. 9848.

Circuit Court of Appeals, Eighth Circuit.
June 12, 1934.

740

Paul J. McGough and Nathan A. Cobb, both of Minneapolis, Minn. (Cobb, Hoke, Benson, Krause & Faegre and S. S. Larson, all of Minneapolis, Minn., on the brief), for appellant.

T. Frank Quinn and Anson B. Jackson, Jr., both of St. Paul, Minn. (Thomas H. Mc-Meekin, of Minneapolis, Minn., and McMeekin & Quinn and Barrows, Stewart, Jackson & Junkin, all of St. Paul, Minn., on the brief), for appellee.

Before GARDNER, WOODROUGH, and VAN VALKENBURGH, Circuit Judges.

GARDNER, Circuit Judge.

This is a personal injury action in which appellee as plaintiff below recovered judgment for $6,500 on account of injuries sustained by her in falling from a second story window of a room in the maids' home maintained as an adjunct of appellant's hospital.

We shall refer to the parties as they appeared in the lower court.

The negligence relied upon is (1) that defendant negligently discharged plaintiff as a patient from its hospital when she was sick and in a condition requiring care; and (2) that it negligently caused her to remain in room No. 3 in the maids' home maintained by defendant, with unguarded windows, when it knew, or should have known, that she had a propensity to walk in her sleep.

At the close of all the testimony defendant moved for a directed verdict, which motion was denied, and the case was sent to the jury on instructions to which defendant took numerous exceptions.

On this appeal it is in substance urged (1) that the court erred in denying defendant's motion for a directed verdict; and (2) that the court erred in its instructions and in denying instructions requested by defendant. There are other alleged errors, but in our view of the issues the substantial questions presented are embodied in the foregoing contentions.

The denial of the motion for a directed verdict presents to this court the question as to whether or not there was any substantial evidence to sustain the alleged acts of negligence. We shall first consider the charge that the defendant negligently discharged plaintiff as a patient from its hospital.

Plaintiff had been employed by the defendant not as a nurse, but as one of its maids, from January 26, 1932, to April 8, 1932. On one occasion during that period she had been a patient at the hospital for a few days because of a lysol burn, but had been discharged and resumed her duties. The only materiality of this incident is that during her stay at the hospital on this occasion, on February 9, 1932, she was observed walking in her sleep. She was put back to bed by an attending nurse, and told the nurse that she often walked in her sleep. Thereafter,

however, she slept all night during the remaining nights she was in the hospital, without doing any sleep walking.

On being discharged, she returned to room No. 3 in the maids' home, where she continued to live for two months, during which time she continued in the employ of the defendant as a maid. Later, being ill, she went privately to Dr. H. B. Sweetser, Jr., who treated her as a private patient. During his treatment of plaintiff, and on April 9, 1932, he requested plaintiff to enter the hospital for the purpose of enabling him better to diagnose her ailment, but she did not enter for treatment. The defendant did not know until plaintiff entered the hospital that she was being treated by Dr. Sweetser, and she had asked him not to notify defendant that she had consulted him. For purpose of diagnosis, she was subjected to an exploratory spinal operation, which involved the puncture of the spinal column and the taking of a sample of fluid therefrom. This operation was performed with the assistance of other surgeons.

At noon, on April 11, 1932, she was discharged by her physician, after being examined not only by Dr. Sweetser, but by a specialist in neurology. These doctors diagnosed her ailment as progressive encephalitis. In discharging her, Dr. Sweetser noted on the hospital records that her physical condition when she was discharged was the same as when she entered the hospital. During the time she was in the hospital for diagnosis and observation, her sleep was normal, she did no sleep walking, and the doctors felt that, although she was ill, she did not need to remain in a hospital; that she was able to go to bed, get up, and generally take care of herself from day to day. The specialist, Dr. Hamilton, testified that:

"Her condition, while not absolutely, was almost certainly, permanent. * * * It would not respond to hospital care. There was nothing in particular that anybody could do for her. The girl was more or less disabled and I believe somebody had to take care of her but I do not think she needed hospital care as such."

Dr. Sweetser had no financial interest in the hospital, and he was neither an employee nor an agent of the defendant; in fact, the court instructed the jury that the defendant could not be held liable for any acts or omissions of Dr. Sweetser. He was not in charge of the hospital, but by arrangement took his patients there for such hospital care as they might require during his treatment of them.

While plaintiff was in the defendant's hospital as Dr. Sweetser's patient, it was not treating her either directly nor through Dr. Sweetser. The duty of determining when plaintiff should be discharged from the hospital was that of her physician and not of the defendant. The hospital may have owed her a duty in relation to the administrative conduct of the hospital while she was a patient, but no such negligence is charged nor claimed. We conclude, therefore, that there was no substantial evidence sustaining the first charge of negligence.

There was submitted to the jury the following interrogatories:

Interrogatory No. 1: "Was defendant negligent in releasing the plaintiff as a patient on April 11, 1932?"

Interrogatory No. 2: "Did the injuries that plaintiff sustained on April 12, 1932, proximately result from such negligence?"

Both these interrogatories were answered in the affirmative.

There is no substantial evidence to sustain the finding that the defendant was negligent in releasing plaintiff as a patient. This might not be fatal to the judgment were it not for the fact that, in answer to interrogatory No. 2, the jury found that plaintiff's injuries proximately resulted from defendant's negligence in releasing plaintiff as a patient. The jury's verdict was therefore based on the finding that plaintiff's injuries resulted from acts for which the defendant was not responsible, and hence the judgment cannot stand.

As a new trial must be granted, we shall consider the second ground of alleged negligence.

When the doctor discharged plaintiff, he spoke to the party in charge of the hospital, advising that he would arrange with plaintiff's cousin to have her returned to relatives in New York. The doctor then requested that she be allowed to remain in room No. 3 in the maids' home, where she had lived for two and a half months preceding, until these arrangements could be perfected. She was therefore permitted to return to this room. She dressed herself, walked downstairs twice, and then walked from the hospital half a block over to the maids' home, where she went to bed. At 5 o'clock on the evening of the same day, she walked half a block to the employees' dining room and had supper, and then returned to the maids' home. Later she walked over to the main office of the hospital to get the money due her for her past services. She

had spells of vomiting, and was nervous and incidentally depressed, but not physically disabled.

The room which she was occupying in the maids' home was 6x12 in dimensions, had one window which was 30⅝ inches high and 31½ inches wide, the sill of which was 8⁷⁄₁₆ inches above the floor, so that the top of the window when fully opened was 39 inches above the floor. The window was equipped with screen which was of the ordinary construction, held in place at the top by dowels fitted into recesses and at the bottom by hooks fastening the screen to the frame or sill. There were no changes made in this room so far as the window and screen are concerned, during the two and a half months it had been occupied by plaintiff.

She awoke, according to her testimony, about 6 o'clock on the morning of April 12. About 7 o'clock, she met Frances Lawless, and asked her to bring over her breakfast. It was then broad daylight, and at about 7:45 Miss Lawless brought over her breakfast, while she was still in bed. Miss Lawless was the last person plaintiff remembers seeing before the accident. Plaintiff testified minutely to all the articles of food that were brought for her breakfast; that after eating breakfast she vomited and went back to bed and slept, and the next thing she knew she was in the air falling.

Two witnesses passed below the window to this room at 8 o'clock in the morning, and noticed nothing on the ground below the window; but one of these witnesses returning five or ten minutes later, noticed the screen from the window lying on the ground, and also noticed that the window was closed. He picked up the screen and leaned it against the north wall of the building, and some fifteen minutes later another witness passing near the window, observed the screen standing against the north wall of the building, and he also noticed that the window was then closed. Some five minutes later, the last-named witness, retracing his steps, heard some one moaning, and observed plaintiff clothed in pajamas lying on the ground below the window of her room. Both the frame and the mesh of the screen were undamaged. The screen frame fitted snugly and securely into the window. The window was found to be open to the extent of 27 inches, which was 4 inches short of its full extent.

As has been observed, plaintiff was a sleepwalker, and it is her claim that she passed out through this window while she was walking in her sleep. There was evidence from which the jury might have found that defendant had notice of plaintiff's habit or propensity of walking in her sleep. She had been afflicted with this peculiarity for years, but, so far as appears from the record, she had never evinced any tendency toward self-destruction while walking in her sleep, nor had she ever evinced any tendency to exercise acts apparently involving deliberate judgment. She might walk about the premises and walk into any unprotected trap, but in the instant case it appears from the physical fact that she must have performed the following affirmative acts: If we assume that the window was up, then she unfastened the screen, letting it fall to the ground, following which she closed the window. Then, waiting some fifteen or twenty minutes, she must have raised the window, and in some manner passed out through it, either by falling or jumping. This she could not have done by simply walking, but she must, after having raised the window, at least have lowered her head, and extended her head and the upper part of her body through the open window, and while in this position, she may either have fallen or jumped out or through the window. There is nothing in the evidence to indicate that such acts on her part could reasonably have been anticipated by the defendant, either from the nature of her habits, affliction, or propensity, or from anything she had ever theretofore done.

The witness Dr. Hamilton, interrogated by the court, said that if he had known at the time plaintiff was discharged from the hospital, what he really knew at the time of the trial with reference to her sleep-walking tendency, it would not change his opinion as to the propriety of discharging her from the hospital. He also testified as follows:

"I have never seen, in the case of a sleep walker, of his or her injury by this procedure. Naturally, if you are considering a case under these circumstances, the point comes up: 'Is the patient going to injure himself or herself, and so on.' Well, you take a precaution against those things that seem probable, or even reasonable,—if probable at all. And I know nothing, in my experience, which suggests that this girl would be likely to injure herself, whether a sleep walker, or whether not a sleep walker."

It must be constantly borne in mind that plaintiff was not being treated as a patient of the hospital; she had been discharged therefrom, and was not under treatment. She

was simply remaining in the quarters which she had occupied as an accommodation to her. But even if she could by any possible construction be held to be a patient, still the defendant could only be liable for the failure to exercise such reasonable care toward her as her known condition might require. This duty is limited by the rule that no one is required to guard against or take measures to avert that which a reasonably prudent person under the circumstances would not anticipate as likely to happen. Fetzer v. Aberdeen Clinic, 48 S. D. 308, 204 N. W. 364, 39 A. L. R. 1423; Ingerson v. Shattuck School, 185 Minn. 16, 239 N. W. 667; Breeze v. St. Louis & S. F. Ry. Co., 264 Mo. 258, 174 S. W. 409; Davis v. Springfield Hospital (Mo. App.) 196 S. W. 104; Illinois Cent. R. Co. v. Cash's Adm'x, 221 Ky. 655, 299 S. W. 590.

Counsel in effect argue that from the time plaintiff left the hospital until the time of the accident the defendant had undertaken to care for her, and that, having undertaken so to do, it owed her the duty of exercising reasonable diligence in the discharge of that undertaking. But when plaintiff was discharged from the hospital, and on request of her physician was permitted temporarily to occupy a room in the maids' home, awaiting the arrival of relatives, the defendant did not undertake to care for her. She was no longer a patient; she was not an employee; she was not a guest, but a mere permissive occupant of this room, and as such was a bare licensee. She was occupying this room for her own convenience, and she must be held to have accepted and enjoyed the license subject to its risks. In this relation the defendant owed her no affirmative duty, and she was bound to accept the premises as she found them. Rhode v. Duff (C. C. A. 8) 208 F. 115; Berlin Mills Co. v. Croteau (C. C. A. 1) 88 F. 860; Peebles v. Exchange Building Co. (C. C. A. 6) 15 F. (2d) 335; Sweeny v. Old Colony & N. Railroad Co., 10 Allen (Mass.) 368, 87 Am. Dec. 644; Reardon v. Thompson, 149 Mass. 267, 21 N. E. 369; Redigan v. Railroad Co., 155 Mass. 44, 28 N. E. 1133, 14 L. R. A. 276, 31 Am. St. Rep. 520; Hafey v. Dwight Mfg. Co., 240 Mass. 155, 133 N. E. 107; Benson v. Traction Co., 77 Md. 535, 26 A. 973, 20 L. R. A. 714, 39 Am. St. Rep. 436; Shults v. Chicago, B. & Q. R. Co., 91 Neb. 587, 136 N. W. 834; Means v. So. Calif. R. Co., 144 Cal. 473, 77 P. 1001, 1 Ann. Cas. 206.

The judgment appealed from is therefore reversed, and the cause remanded to the lower court, with directions to grant the defendant a new trial.